UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

PAUL FOSTER,

                    Petitioner,

v.                             Case No. 3:08-cv-530-J-34JBT

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS, et al.,

                    Respondents.

_____

## ORDER

### I. Status

Petitioner Paul Foster, who is proceeding pro se, initiated this action by filing a Petition for Writ of Habeas Corpus (Petition) (Doc. #1) under 28 U.S.C. § 2254 on May 21, 2008, pursuant to the mailbox rule. Petitioner challenges a 2000 state court (Duval County, Florida) judgment of conviction for first degree murder, armed burglary, and two counts of aggravated battery, asserting that (1) his counsel was ineffective because she failed to conduct a pretrial investigation; (2) the trial judge abused his discretion by routinely inviting the jurors to ask the witnesses questions throughout the trial; (3) the trial judge improperly commented on facts not in evidence; and (4) the trial judge denied Petitioner a fair trial when he denied his motion for a mistrial.

Respondents have submitted a memorandum in opposition to the Petition. See Respondents' Answer to Petition for Writ of Habeas Corpus (Response) (Doc. #13).[1] On June 27, 2008, the Court entered an Order to Show Cause and Notice to Petitioner (Doc. #7), admonishing Petitioner regarding his obligations and giving Petitioner a time frame in which to submit a reply. Petitioner submitted a brief in reply on February 26, 2009. See Petitioner's Reply to Respondents' Brief (Reply) (Doc. #20). This case is ripe for review.

## II. Procedural History

On April 1, 1999, Petitioner Foster was charged with first degree murder, armed burglary, and two counts of aggravated battery. Resp. Ex. A, Indictment. After jury selection, Petitioner proceeded to a jury trial. Resp. Ex. B, Transcript of the Jury Trial Proceedings (Tr.). At the conclusion of the trial, a jury found Petitioner guilty, as charged in the Indictment, of first degree murder, armed burglary, and two counts of aggravated battery. Resp. Ex. C, Verdicts; Tr. at 1646-47. On November 7, 2000, the trial court sentenced Petitioner to a term of life imprisonment without parole for the murder, a consecutive term of life imprisonment without parole for the armed burglary, and fifteen years of incarceration for the two counts of aggravated

---

[1] The Court will refer to Respondents' exhibits as "Resp. Ex."

2

battery. Resp. Ex. D, Judgment; Transcript of the Sentencing Hearing.

On appeal, Petitioner, through counsel, filed an Amended Initial Brief, raising the following claims: (1) the trial court abused its discretion in routinely inviting juror questioning of the witnesses throughout the trial where there were no extraordinary or compelling circumstances; (2) the trial court improperly commented on matters not in evidence by telling the jury that Foster's apparent limp was unrelated to the allegations and developed after the date in question; (3) the trial court erred in overruling the defense objection and denying a motion for mistrial after the prosecutor made a comment disparaging defense counsel; (4) the trial court erred in permitting Officer Karst to testify about a piece of asphalt Foster allegedly threw into a car in which Nathan Perry was seated; (5) the trial court erred in denying the defense's request to admit a 911 tape as surrebuttal to Officer Karst's testimony regarding the January 25th incident between Foster and Perry, where the tape contained a witness's statement that a man had just been hit by a car and was still in the road; and (6) the trial court erred in denying defense counsel's motion to take judicial notice of Florida's adultery statute, where a primary state witness benefitted by not being prosecuted under the statute. Resp. Ex. E. The State filed an Answer Brief. Resp. Ex. F. Thereafter, Petitioner filed a Reply Brief. Resp. Ex. G. On

August 30, 2002, the appellate court affirmed Petitioner's conviction and sentence per curiam without issuing a written opinion. Foster v. State, 826 So.2d 285 (Fla. 1st DCA 2002); Resp. Ex. H. The mandate issued on September 18, 2002. Resp. Ex. I. Petitioner's pro se motions for rehearing and to recall mandate, Resp. Exs. J; K, were denied on December 6, 2002. Resp. Ex. L. Petitioner did not seek review in the United States Supreme Court.

Petitioner filed a pro se motion for post conviction relief pursuant to Florida Rule of Criminal Procedure 3.850 (Rule 3.850 motion) on January 6, 2003, arguing that the trial court erred and that his counsel was ineffective because she failed to (1) adequately investigate and prepare for trial; (2) impeach prosecution witnesses; (3) ensure Petitioner's presence at depositions; (4) properly object and oppose the prosecution's use of cumulative hearsay evidence; (5) object to the prosecutor's statement regarding shifting the burden of proof to the defendant; and (6) advise Petitioner of his rights regarding testifying. Resp. Ex. M. The circuit court denied the Rule 3.850 motion on March 12, 2007. Resp. Ex. N.

Petitioner appealed. Resp. Ex. O. On January 11, 2008, the appellate court affirmed the denial per curiam. Foster v. State, 973 So.2d 445 (Fla. 1st DCA 2008); Resp. Ex. P. The mandate issued on February 6, 2008. Resp. Ex. Q.

4

### III. One-Year Limitations Period

The Petition is timely filed within the one-year period of limitations.  See 28 U.S.C. § 2244(d); Response at 5-6.

### IV. Evidentiary Hearing

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id.  The pertinent facts of this case are fully developed in the record before the Court.  Because this Court can "adequately assess [Petitioner's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), cert. denied, 541 U.S. 1034 (2004), an evidentiary hearing will not be conducted.

### V.  Standard of Review

The Court will analyze Petitioner's claims under 28 U.S.C. § 2254(d).  This standard is described as follows:

> As explained by the Supreme Court, the phrase "'clearly established Federal law' . . . refers to the holdings . . . of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120

5

S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).   We
have held that to be "contrary to" clearly
established federal law, the state court must
either (1) apply a rule "that contradicts the
governing law set forth by Supreme Court case
law," or (2) reach a different result from the
Supreme Court "when faced with materially
indistinguishable facts." Putman v. Head, 268
F.3d 1223, 1241 (11th Cir. 2003).

As regards the "unreasonable application"
prong of § 2254(d)(1), we have held as
follows:

> A state court decision is an
> unreasonable application of clearly
> established law if the state court
> unreasonably extends or fails to
> extend a clearly established legal
> principle to a new context.   An
> application of federal law cannot be
> considered unreasonable merely
> because it is, in our judgment,
> incorrect or erroneous; a state
> court decision must also be
> unreasonable. Questions of law and
> mixed questions of law and fact are
> reviewed de novo, as is the district
> court's conclusion regarding the
> reasonableness of the state court's
> application of federal law.

Jennings v. McDonough, 490 F.3d 1230, 1236
(11th Cir. 2007) (quotation marks and
citations omitted).   In sum, "a federal habeas
court making the 'unreasonable application'
inquiry should ask whether the state court's
application of clearly established federal law
was objectively unreasonable." Williams, 529
U.S. at 409, 120 S.Ct. at 1521.   Finally, 28
U.S.C. § 2254(e)(1) commands that for a writ
to issue because the state court made an
"unreasonable determination of the facts," the
petitioner must rebut "the presumption of
correctness [of a state court's factual

6

findings] by clear and convincing evidence."[2]
28 U.S.C. § 2254(e)(1).

Ward v. Hall, 592 F.3d 1144, 1155-56 (11th Cir. 2010), cert. denied, 131 S.Ct. 647 (2010).

Finally, for a state court's resolution of a claim to be an adjudication on the merits, so that the state court's determination will be entitled to deference for purposes of federal habeas corpus review under AEDPA, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling. Harrington v. Richter, 131 S.Ct. 770, 785 (2011) (holding that section 2254(d) does not require a state court to give reasons before its decision can be deemed to have been adjudicated on the merits); Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002), cert. denied, 538 U.S. 906 (2003).   Thus, to the extent that Petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under § 2254(d).

## VI. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel.   That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v.

---

[2] This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." Bui v. Haley, 321 F.3d 1304, 1312 (11th Cir. 2003) (footnote omitted) (citing Sumner v. Mata, 449 U.S. 539, 547 (1981)).

<u>Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (citing <u>Wiggins v. Smith</u>,

539 U.S. 510, 521 (2003), and <u>Strickland v. Washington</u>, 466 U.S.

668, 687 (1984)).

> To establish deficient performance, a
> person challenging a conviction must show that
> "counsel's representation fell below an
> objective standard of reasonableness."
> [<u>Strickland</u>,] 466 U.S. at 688, 104 S.Ct. 2052.
> A court considering a claim of ineffective
> assistance must apply a "strong presumption"
> that counsel's representation was within the
> "wide range" of reasonable professional
> assistance. <u>Id</u>., at 689, 104 S.Ct. 2052. The
> challenger's burden is to show "that counsel
> made errors so serious that counsel was not
> functioning as the 'counsel' guaranteed the
> defendant by the Sixth Amendment." <u>Id</u>., at
> 687, 104 S.Ct. 2052.

> With respect to prejudice, a challenger
> must demonstrate "a reasonable probability
> that, but for counsel's unprofessional errors,
> the result of the proceeding would have been
> different. A reasonable probability is a
> probability sufficient to undermine confidence
> in the outcome." <u>Id</u>., at 694, 104 S.Ct. 2052.
> It is not enough "to show that the errors had
> some conceivable effect on the outcome of the
> proceeding." <u>Id</u>., at 693, 104 S.Ct. 2052.
> Counsel's errors must be "so serious as to
> deprive the defendant of a fair trial, a trial
> whose result is reliable." <u>Id</u>., at 687, 104
> S.Ct. 2052.

<u>Harrington</u>, 131 S.Ct. at 787-88. Since both prongs of the two-part

<u>Strickland</u> test must be satisfied to show a Sixth Amendment

violation, "a court need not address the performance prong if the

petitioner cannot meet the prejudice prong, and vice-versa." <u>Ward</u>,

592 F.3d at 1163 (citation omitted). "Surmounting <u>Strickland</u>'s

high bar is never an easy task." Harrington, 131 S.Ct. at 788 (quoting Padilla v. Kentucky, 130 S.Ct. 1473, 1485 (2010)).

A state court's adjudication of an ineffectiveness claim is accorded great deference. "The standards created by Strickland and § 2254(d) are both 'highly deferential,' [Strickland], at 689, 104 S.Ct. 2052; Lindh v. Murphy, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, Knowles[3], 556 U.S., at ----, 129 S.Ct. at 1420." Harrington, 131 S.Ct. at 788.

> The question "is not whether a federal court believes the state court's determination" under the Strickland standard "was incorrect but whether that determination was unreasonable - a substantially higher threshold." Schriro, supra, at 473, 127 S.Ct. 1933. And, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

Knowles v. Mirzayance, 129 S.Ct. 1411, 1420 (2009); see also Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004) ("In addition to the deference to counsel's performance mandated by Strickland, the AEDPA adds another layer of deference--this one to

---

[3] Knowles v. Mirzayance, 129 S.Ct. 1411 (2009).

9

a state court's decision--when we are considering whether to grant federal habeas relief from a state court's decision.").

## VII. The Evidence Presented at Trial

In denying the Rule 3.850 motion, the state court set forth the evidence presented against Petitioner at the trial:

> For many months prior to the homicide, the defendant and his wife (Stephanie Foster) had been separated. As with some separations, theirs had been less than pleasant. The separation was filled with the defendant's threats of violence against the wife and her suspected paramour (Nathan Perry). Upon the separation, the wife moved into the home of a female friend (Cassandra Worley). The paramour accompanied her. Worley's boyfriend (Carlos Singletary) also stayed at the residence.

> Presumably to the chagrin of the defendant, Nathan Perry, the paramour, was a sixteen (16) year old boy. The wife was fully aware of his age and knew that their relationship was illegal. (In fact, after his murder[,] the wife was arrested and prosecuted for her relations with the boy.) Over time the defendant's threats escalated. They included statements to friends, family members, and even the boy's parents, that unless the boy left the wife, the defendant was going to "cut his heart out like a chicken." Although a domestic violence injunction was entered against the defendant, witnesses regularly saw him stalking the wife and hiding in the bushes outside the Worley home. On more than one occasion[,] the defendant apparently slept in a bedroll in those bushes.

> The defendant's threats became so malevolent that the wife finally agreed with a family friend that she should begin the dissolution proceeding which she had delayed. When the defendant learned of her final decision to divorce him, his threats became so violent and imminent that the wife and her

roommate suggested that the boy should return to his home and away from the wife until matters cooled down.

During the day before the murder, the defendant called the home on separate occasions and spoke to Worley and Singletary. He told each of them that unless the boy left his wife he was going to kill the boy. He also demanded that each of them leave the back door unlocked that night. During the evening before the murder, the defendant called the residence and spoke to Nathan telling him that he was going to kill him if he didn't leave. The wife, having picked up the extension telephone, overheard the entire conversation.

Heeding the advice of the wife and her friends, Nathan made an effort to depart but was unable to reach anyone to come and pick him up. He decided, instead, to spend that night and to leave the following the [sic] morning.

At approximately 3:00 in the morning, the wife and other occupants of the home heard dogs barking, then heard the alarm system beeping. Upon inspection, a code was seen on the data window of the alarm system reporting that someone had tampered with the external telephone line to the system.

Within moments, the defendant was at the front door of the residence, demanding to see the wife. Singletary was able to delay him for a few moments but the defendant was able to get through the unlocked door. Armed with a knife, the defendant rushed into the home and dashed immediately to the wife's bedroom. When she tried to keep him from entering the bedroom, she was stabbed and received multiple cuts. The defendant proceeded into the bedroom where Nathan still lay in the bed. The defendant stabbed him six (6) times, including once through the heart. The defendant then departed.

11

During the attack, Worley attempted to alert the security company to call the police by pushing the panic button of the alarm system. The alarm never went out as the defendant had cut the telephone line. Singletary attempted to stop the defendant by swinging at him with a long wrench, but the defendant cut him also and made good his escape.

Nathan died almost instantly. Though they were life threatening, the wife survived her wounds. The defendant was arrested by the Jacksonville Sheriff's Office not long after the murder.

For his part, the defendant elected to testify and claimed self-defense.

The defendant testified, in essence, that his wife was a trollop and that he was glad to be rid of her. He related that the night of the murder, she had actually called him and enticed him to come to the residence to sign some papers. When he arrived the wife answered the door with the papers in her hand and invited him in. When he stepped inside the residence and the door was closed, Nathan was behind the door armed with a 9mm handgun. According to the defendant, Nathan demanded to know why the defendant had gone to Nathan's parents about Nathan's relationship with the wife.

Assuming that he was about to be shot, and realizing that he had nothing to lose, the defendant attacked the boy, who dropped the gun during the struggle. The defendant broke away and tried to run from the residence, but instead ran the wrong way and accidentally ran into the wife's bedroom. When he realized his error, he turned to leave only to see that Nathan had followed him into the bedroom, this time armed with a knife. A fight ensued. The boy was accidentally cut by the knife and accidentally stabbed when the defendant stumbled during the struggle. The defendant also related that the cuts to his wife were

accidental and had happened during the
defendant's struggle with the boy and the
knife. The defendant was able to then get
away. The next day he met with his attorney
and sought to turn himself in to the
Jacksonville Sheriff's Office.

Resp. Ex. N at 1-4.

## VIII. Findings of Fact and Conclusions of Law

### A. Ground One

As ground one, Petitioner claims counsel was ineffective
because she failed to adequately investigate and prepare for trial.
Memorandum at 1; Reply at 3. As acknowledged by the parties,
Petitioner raised this ground in his Rule 3.850 motion, as ground
one. Ultimately, the court denied the motion on the merits with
respect to this claim, stating in pertinent part:

The defendant further alleges in this
ground that there was a "total failure to
conduct a reasonable pretrial investigation."
As a result of this, the defendant contends
that trial counsel failed to conduct a "self-
defense for defendant Foster." In addition,
trial counsel failed to exclude conflicting
evidence from the State's case, specifically
failing to object to lies being made by the
State's witnesses.

As noted in the factual summary above,[4]
the defendant elected to present a self-
defense case and did so. . . .

Resp. Ex. N at 5. Upon Petitioner's appeal, the appellate court
affirmed the denial per curiam.

_____

[4] As quoted in Section VII. of this Order, the state court set
forth a summary of the evidence heard by the jury. Resp. Ex. N at
1-4.

Assuming the appellate court affirmed the denial of the Rule 3.850 motion on the merits, there are qualifying state court decisions.  Therefore, this claim will be addressed applying the deferential standard for federal court review of state court adjudications required by AEDPA.  After a thorough review of the record and the applicable law, the Court concludes that the state courts' adjudications of this claim were not contrary to clearly established federal law and did not involve an unreasonable application of clearly established federal law.  Nor were the adjudications based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Petitioner is not entitled to relief on the basis of this claim.

Alternatively, if the state courts' adjudications of this claim are not entitled to deference under AEDPA, Petitioner's claim is, nevertheless, without merit.  Petitioner has failed to establish that counsel's performance was deficient in the investigation and preparation for trial.  Petitioner has not alleged any particular investigative tactic that trial counsel should have conducted that would have resulted in a different outcome.  Moreover, he has not asserted how counsel's failure to consult an expert witness to challenge the prosecution's witness regarding the cause of death prejudiced him.  Petitioner suggests that trial counsel should have called the witnesses at the home to

testify as to Petitioner's state of mind immediately after being confronted by the victim who was armed with a handgun.   See Memorandum at 9.   However, the witnesses at the home testified for the prosecution, and defense counsel cross-examined each witness. Additionally, Petitioner testified about his version of the events and his state of mind.   Even assuming arguendo deficient performance by defense counsel, given the strong evidence of guilt, Petitioner has not shown prejudice.   Accordingly, Petitioner's ineffectiveness claim is without merit since he has shown neither deficient performance nor resulting prejudice.

## B. Ground Two

As ground two, Petitioner asserts that his constitutional right to due process of law was violated when the trial judge routinely invited the jurors to ask the witnesses questions throughout the trial.   He alleges that, as a result of the judge's abuse of discretion, the jurors asked a total of nine questions directed to five witnesses, including one question to Petitioner. To the extent that Petitioner presented the issue on direct appeal in terms of a federal constitutional violation, see Resp. Exs. E at 27; G at 4, this claim is sufficiently exhausted.

Even assuming Petitioner raised this as a federal constitutional claim on direct appeal, the State, in its appellate brief, addressed the claim on the merits.   Resp. Ex. F at 8-18. Thus, the appellate court may have affirmed Petitioner's conviction

15

based on the State's argument on the merits.   If the appellate court addressed the merits, Petitioner would not be entitled to relief because the state court's adjudication of this claim is entitled to deference under AEDPA.[5]  After a thorough review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.[6]

---

[5] See Wright, 278 F.3d at 1255.

[6] Although Petitioner cites Chambers v. Mississippi, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."), see Reply at 7-8, the Court is not aware of any cases of the United States Supreme Court holding that the procedure of allowing jurors to submit questions at a criminal trial constitutes error that mandates reversal of a defendant's convictions.  In fact, many federal courts have held that such a practice is permissible in certain circumstances in federal criminal trials.  See United States v. Rawlings, 522 F.3d 403, 407 (D.C. Cir. 2008); United States v. Richardson, 233 F.3d 1285, 1289 (11th Cir. 2000) ("[W]e reject outright Richardson's argument that permitting juror questioning of witnesses is per se error."), cert. denied, 532 U.S. 913 (2001); United States v. Collins, 226 F.3d 457, 463 (6th Cir. 2000) ("[T]here will be occasions when a district court may determine that the potential benefits to allowing such questions will outweigh the risks."), cert. denied, 531 U.S. 1099 (2001); United States v. Bush, 47 F.3d 511, 514 (2nd Cir. 1995) (stating "direct questioning by jurors is a 'matter within the judge's discretion'"); United States v. Callahan, 588 F.2d 1078, 1086 (5th Cir. 1979) ("There is nothing improper about the practice of allowing occasional questions from jurors to be asked of witnesses."), cert. denied, 444 U.S. 826 (1979).

16

Moreover, even assuming that the state court's adjudication of this claim is not entitled to deference, Petitioner's claim is without merit.  The decision to allow juror questioning and the manner of that questioning rests in the sound discretion of the trial judge, and it does not violate a defendant's constitutional right to a trial by a fair and impartial jury if the court employs sufficient safeguards to eliminate the risk of prejudice.  The Supreme Court of Florida has approved juror questioning as long as the trial court controls the procedure.  Watson v. State, 651 So.2d 1159 (Fla. 1994), cert. denied, 516 U.S. 852 (1995).  Finding no merit to the defendant's claim that the trial court violated his right to an impartial jury when it allowed the jurors to submit questions to the witnesses, the court stated "this practice has been condoned as permissible trial procedure."  Id. at 1163 (citations omitted).  Thus, the court found no error in the following procedure: "The juror would write the question down, give it to the judge, who would consult with the state and defense attorneys, and if the question was proper, the judge would present it to the witness." Id. at 1163 n.6.

That is the procedure the trial judge employed at Petitioner's trial.  When the trial judge informed counsel that he planned to instruct the jurors that they could ask the witnesses questions, defense counsel objected.  Tr. at 241.  The trial judge then explained the procedure:

> I have a fairly standard instruction, says
> that they are subject to the same rules about
> questions that the lawyers are.  If they want
> to ask a question they have to write it down,
> give it to the bailiff.  We will meet at the
> sidebar.  If it's a fair question and it's
> relevant and not any objections then I will
> pose the question to the witness and the
> witness gets to answer. Y'all [sic] get to
> follow up.  If it's not an appropriate
> question we don't make reference to it.
>
> My experience is that nine times out of
> ten the questions that have been asked are
> clarification questions.  I think there may be
> occasionally a question that I won't answer,
> but my experience is most of the time the
> questions help the jury understand what's been
> going on.
>
> . . . .
>
> Most of the time they are not going to have
> any questions.

Id. at 243-44.  When defense counsel requested that the record

reflect her standing objection, the court agreed.  Id. at 244.

After defense counsel's opening statement, the trial judge

instructed the jurors that they would be permitted to take notes

and ask questions of the witnesses.

> I have -- actually two things that I have
> failed to mention in the opening instructions
> is two things that you are going to be
> permitted to do during the course of this
> trial in my view given the length of the trial
> and, secondly, given the nature of the trial.
>
> The first is that you are going to be
> allowed to ask questions of the witnesses if
> you want.  Now there are some very stringent
> rules about your doing that.  The same rules
> that apply to the attorneys, rules of
> evidence, rules of procedure will also apply

to any questions that you might want to ask, and this is the way we will do it.

When both sides have finished all of the questions that they want to ask of any particular witness, if any of you have a question I have some note pads here. If you will write the question down and simply pass it up -- you can do this during the course of the questioning of the witness, also.

If you want to put your question up there on the bar before the jury what I will do is I will meet with the attorneys over here at the sidebar. We will go over the question. If it's an appropriate question then I will ask the witness the question. The witness will answer and then the attorneys if they want to will get to follow up with whatever the answer is.

Not all questions will be posed. If I do not ask your question you should not infer anything. There are rules and as I have just said the same rules apply to you as apply to the attorneys so, you know, some questions I am simply not going to ask. They might not be relevant. They might not be in certain provisions of the statutes. Any number of reasons I might not permit you to pose that question.

By the same token I probably wouldn't allow the lawyers to ask the same questions, so if the question is not asked don't draw any inferences from it, but if you do have a question or questions then that will be the appropriate time.

Let me warn you that sometimes I forget to turn to you and say -- ask you if you have any questions, so if you do have a question catch my eye and let me know.

Id. at 269-71. Where trial judges have employed a similar procedure "in a carefully controlled environment," the state

district courts of appeal have approved jury questioning of witnesses. Coates v. State, 855 So.2d 223, 225 (Fla. 5th DCA 2003), rev. denied, 866 So.2d 1212 (2004); Patterson v. State, 725 So.2d 386 (Fla. 1st DCA 1998) (per curiam); Bradford v. State, 722 So.2d 858, 859-60 (Fla. 1st DCA 1998).

At Petitioner's trial, an examination of the jurors' questions permitted by the trial judge shows no prejudice to Petitioner.[7] The first question was directed to Stephanie Foster: "Why was Nathan leaving the house?" Tr. at 492. This question concerned the sixteen-year-old victim with whom Ms. Foster was having a love affair and refers to her testimony that she had asked him to move out of the house she and her children shared with another couple. In agreeing to ask the question, the trial judge stated it would clarify the evidence. Id. at 495. Ms. Foster answered: "Because I didn't want him living there while I am going through my divorce, and Cassandra told me he had to leave." Id. at 496. The second question was also directed to Ms. Foster and related to Petitioner's controlling behavior, about which she had previously testified, see id. at 285, 287: "What manifestations of possessiveness and jealousy were there?" Id. at 492. When the trial judge asked Ms. Foster the question, she did not understand the question, and therefore, did not answer it. Id. at 496. The

---

[7] The trial judge did not allow all the questions that the jurors proposed. See Tr. at 492-96 (Stephanie Foster); 720 (Carlos Singletary); 1031-35 (Mark E. Doyle).

trial judge commented: "That's as far as I think I can go at this point on that matter . . . ." Id.

The third question, directed to Carlos Singletary, was: "How long was the defendant in the house?" Id. at 720.  Defense counsel agreed[8] to this question.  Nevertheless, when the trial judge asked Singletary the question ("On the night of the incident how long was the defendant in the house?"), he responded that he did not know. Id. at 720-21.  Moreover, the question was simply an attempt at further fact-finding, which is within the realm of the jury's role.

Petitioner argues that the fourth question, posed by a juror and directed to Yvonne Singletary Lee, was: "The night you gave the defendant the phone, did the police come?"  Memorandum at 15 n.1; Resp. Ex. E at 26 n.1; Tr. at 751.  However, contrary to Petitioner's assertions, this question was not generated by a juror, but by the trial judge.  After the direct and cross examinations, the trial judge asked the question.  The following colloquy transpired.

> THE COURT: The night that you gave Mr. Foster the phone to call the police, did the police in fact come?
>
> THE WITNESS: I am not sure.
>
> THE COURT: You don't know because you went back in?

---

[8] While defense counsel approved of the question, she reminded the judge of her previous standing objection to juror questions throughout the trial.  Tr. at 720.

Case 3:08-cv-00530-MMH-JBT   Document 22   Filed 08/19/11   Page 22 of 32 PageID 211

THE WITNESS: I went back in the room.

THE COURT: Mr. Bledsoe or Ms. Sopp, anything further?

MR. BLEDSOE: I have no further questions of the witness.

THE COURT: Ms. Sopp.

MS. SOPP: Nothing further.

THE COURT: May she be excused?

MR. BLEDSOE: **She may unless the Court wants to inquire if the jurors have a question.**

THE COURT: **Sorry.  I remember myself but not the jury.  Apparently not.**  Ma'am, you may be excused. . . .

Id. at 751 (emphasis added).

The next four questions, posed by the jury and permitted by the trial judge, were directed to the evidence technician, Mark E. Doyle: (1) "How far was it from the front door to the bedroom?" (id. at 1031, 1033); (2) "How many knives were found?" (id.); (3) "Did all of them [(the knives)] have blood on them?" (id. at 1031, 1034-35); and (4) "Was there any marking on the cut wires that identify them as for the security system?" (id. at 1032, 1035). Petitioner characterizes these questions as indicating that "these jurors already were deliberating," see Memorandum at 16; however, these questions were to clarify factual matters.  Doyle's answers demonstrate that the questions were appropriate and not prejudicial to Petitioner.  Tr. at 1033-35 (the approximate distance is

22

probably about 21 to 22 feet; Doyle collected six knives; Doyle affirmed the trial judge's supposition that Doyle would not have any personal knowledge about any blood stains on the knives since that would be a matter for the laboratory; and Doyle could not determine whether the phone wires were connected to the security system).

The final question posed by the jury and permitted by the trial judge was directed to Petitioner: "Does the defendant have a disability?"  The trial judge answered the question.  Petitioner asserts that the judge's answer "was an improper comment on the evidence."  Memorandum at 16.  This issue will be addressed in Section VIII. relating to ground three.

Over twenty witnesses testified in the seven-day trial. During the lengthy proceedings, the trial judge permitted eight jury questions, which were directed to four witnesses, including one question to Petitioner.  Petitioner concedes that "the questioning was not extensive." Memorandum at 15.  Additionally, the record reflects that most of the questions were to clarify the facts and none of the responses were prejudicial to Petitioner. The trial judge used extreme caution in determining which questions were appropriate.  Since he carefully screened the written questions, considered the parties' objections outside the jury's presence, and asked only eight questions, this Court concludes that he did not abuse his discretion.  Moreover, there was no

fundamental unfairness or prejudice to Petitioner due to the trial judge's stringent procedures.  See Coates, 855 So.2d at 225-26.

## C. Ground Three

As ground three, Petitioner asserts that the trial judge, in answering a juror's question, improperly commented on facts not in evidence, thus violating his right to due process of law.  To the extent that Petitioner presented the issue on direct appeal in terms of a federal constitutional violation, this claim is sufficiently exhausted.  See Resp. Ex. E at 28-33.

Even assuming Petitioner raised this as a federal constitutional claim on direct appeal, the State, in its appellate brief, addressed the claim on the merits.  Resp. Ex. F at 21-24. Thus, the appellate court may have affirmed Petitioner's conviction based on the State's argument on the merits.  If the appellate court addressed the merits, Petitioner would not be entitled to relief because the state court's adjudication of this claim is entitled to deference under AEDPA.  After a thorough review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Moreover, even assuming that the state court's adjudication of this claim is not entitled to deference, Petitioner's claim is without merit.  The relevant facts are as follows.  As a security measure during the trial, Petitioner wore a leg brace under his clothing.  Tr. at 1473.  After Petitioner testified, the judge inquired as to whether the jury had any questions for Petitioner. Id. at 1333.  The only question from the jury was: "Does the defendant have a disability?"  Id. at 1334.  In a sidebar discussion with the attorneys, see id. at 1335, the judge noted that Petitioner was limping because of the leg brace and stated that he did not want the jury to think that Petitioner was limping due to Perry allegedly bumping Petitioner with a car on January 25, 1999.  See also id. at 1293-94, 1399, 1406.

When the prosecutor argued that he did not want the jury to think Petitioner had a disability on February 3rd, the date of the incident, and defense counsel asserted that Petitioner had disabilities on that date, the trial judge informed the parties that they would be permitted to ask follow-up questions if they chose to do so.  Id. at 1336.  Thus, the trial judge answered the question for the jury:

> This is the question and let me answer it because of something I have observed and [if] it answers the question, fine.  If not I will allow another question.
>
> **In the event that you have noticed that Mr. Foster walks with a limp it is absolutely unrelated to the allegations.  That happened**

> **to date with something that is chronologically
> after the date in question**. . . .

Id. at 1337 (emphasis added).  Thus, the judge's remark was neither a comment upon the weight of the evidence, the credibility of the witnesses, nor the guilt of the accused, but rather, it was his attempt to provide an accurate response to the jury's question and avoid any suggestion that Petitioner was restrained as a security measure because he might flee.  Moreover, the trial judge gave defense counsel the option of pursuing her assertions that Petitioner had been disabled at the time of the incident, and she declined to do so.  In sum, the trial judge did not abuse his discretion.  Moreover, even assuming error, it was not the sort that violated fundamental due process vitiating the entire trial.

## D. Ground Four

As ground four, Petitioner asserts that the trial judge denied Petitioner a fair trial when he denied his motion for a mistrial. He alleges that the prosecutor, during the trial, made "disparaging and denigrating remarks" about defense counsel, and therefore, defense counsel moved for a mistrial.  Petition at 10; Memorandum at 22-25.  To the extent that Petitioner presented the issue on direct appeal in terms of a federal constitutional violation, this claim is sufficiently exhausted.  See Resp. Ex. E at 34-36.

Even assuming Petitioner raised this as a federal constitutional claim on direct appeal, the State, in its appellate brief, addressed the claim on the merits.  Resp. Ex. F at 25-28.

Thus, the appellate court may have affirmed Petitioner's conviction based on the State's argument on the merits. If the appellate court addressed the merits, Petitioner would not be entitled to relief because the state court's adjudication of this claim is entitled to deference under AEDPA. After a thorough review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law and did not involve an unreasonable application of clearly established federal law. Moreover, the adjudication was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Even assuming that the state court's adjudication of this claim is not entitled to deference, Petitioner's claim is without merit. The relevant facts are as follows. During the direct examination of Ms. Foster, the following transpired.

> BY MR. BLEDSOE:
>
> Q   Mrs. Foster, I am showing you what has been marked for identification as state's exhibit K, and without showing it to the members of the jury at this time I ask you to look at it and I ask you if you recognize it?
>
> A   Yes, I do.
>
> Q   What do you recognize this to be?
>
> A   The jacket that I gave to Paul.

Q    Okay.   Are you certain this is the jacket that you gave to your husband, this defendant?

MS. SOPP: I am going to object.   That's improper bolstering of the witness' testimony. The question has been asked and answered and also this item is not into evidence yet so I don't think it's proper for the witness to identify it until it's moved into evidence.

THE COURT: How does he get it into evidence until she identifies it?

MS. SOPP: She has to identify it and the person that found it and took it into evidence [sic] needs to come and testify.   She did not do that.

MR. BLEDSOE: I am simply asking this witness if she recognizes this exhibit.

MS. SOPP: She can't testify as to what it is.

**MR. BLEDSOE: Your Honor, I don't know where counsel went to law school.**

THE COURT: Whoa, whoa.

MS. SOPP: Judge, I am going to ask that the jury be excused.

THE COURT: Both of you time out. Objection is overruled.   One or two more questions and move on.

**MS. SOPP: I would like to move on the record for a mistrial based on the prosecutor's comment and personal attack on defense counsel.**

**THE COURT: The request is denied.**

MR. BLEDSOE: I retract that.   I do apologize.

28

THE COURT: I will not have fist to cuffs[9] during the course of this trial.

MR. BLEDSOE: I apologize.

BY MR. BLEDSOE:

Q      Ma'am, do you recognize this exhibit?

A      Yes.

Q      All right.  And what is it?

A      It's a jacket that I gave Paul.

Tr. at 372-74 (emphasis added).

Here, even assuming the prosecutor's remark was improper, Petitioner has not shown that the remark prejudicially affected Petitioner's substantial rights.  See Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1182 (11th Cir. 2010) (setting forth the two-pronged test for prosecutorial misconduct).  The reversal of a conviction is warranted only when improper comments by a prosecutor have "'so infected the trial with unfairness as to make the resulting conviction [or sentence] a denial of due process.' Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974))." Parker v. Head, 244 F.3d 831, 838 (11th Cir. 2001).  This Court has thoroughly reviewed the

---

9 This appears to be a mistranscription of the word "fisticuffs," which means a fight with bare fists.

29

record and is convinced that the comment did not result in a due process violation.

## IX. Conclusion

Upon consideration of the foregoing, the undersigned finds that "[u]nder the doubly deferential judicial review that applies to a <u>Strickland</u> claim evaluated under the § 2254(d)(1) standard, <u>see</u> <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5-6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam)," Petitioner's ineffective assistance claim fails. <u>Knowles v. Mirzayance</u>, 129 S.Ct. 1411, 1420 (2009). The remainder of Petitioner's claims are without merit. Accordingly, for the above-stated reasons, the Petition will be denied, and this case will be dismissed with prejudice.

## X. Certificate of Appealability
## Pursuant to 28 U.S.C. § 2253(c)(1)

If Petitioner seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. This Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed

further,'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. <u>See Slack</u>, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Id</u>. Upon consideration of the record as a whole, this Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.   The Petition (Doc. #1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE.**

2.   The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.   If Petitioner appeals the denial of the Petition, the Court denies a certificate of appealability. Because this Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions

report any motion to proceed on appeal as a pauper that may be filed in this case.  Such termination shall serve as a denial of the motion.

    4.  The Clerk of the Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 19th day of August, 2011.

MARCIA MORALES HOWARD
United States District Judge

sc 8/18
c:
Paul Foster
Ass't Attorney General (Conley)

32